TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-08-00528-CR






Eric Michael White, Appellant


v.


The State of Texas, Appellee






FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT

NO. 61643, HONORABLE JOE CARROLL, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 A jury found Eric Michael White guilty of injury to a child with intent to cause
serious bodily injury, a first-degree felony. See Tex. Penal Code Ann. § 22.04(a)(1), (e) (West Supp.
2009). The trial court assessed White's punishment at life imprisonment. In his sole point of error,
White contends that the trial court erred in denying his motion for new trial based on ineffective
assistance of trial counsel. Because we conclude that White did not carry his burden of proving that
his trial counsel provided ineffective assistance, we affirm the trial court's judgment. 


BACKGROUND

 At about 9 p.m. on May 30, 2007, Jolynn Cammisa left her home to pick up beer for
White, her live-in boyfriend. White had asked her to get the beer from a room he had at his barracks
on Fort Hood. At first, Cammisa planned to take her seven-month-old daughter, S.B., with her on
the errand. In preparation for doing so, she changed S.B.'s diaper and clothes. She then laid S.B.
on a mattress on the floor next to a computer where White was playing video games. She asked
White to watch the baby while she got dressed to leave. When Cammisa returned after dressing,
White was patting S.B. on her back, and S.B. had fallen asleep. White told Cammisa that she could
leave S.B. at home and he would take care of her. Cammisa testified at trial that White had had "a
few beers" at the time she left the house. 

 Cammisa testified that it took her about fifteen minutes to get to the barracks. While
she was there, at 9:26 p.m., she called White to ask him how S.B. was doing, but White did not
answer his phone. Cammisa got the beer and started back home, stopping only briefly on the way
to take a photo of the full moon with the camera on her mobile phone. When she arrived at her
house and was about to unlock the side door, White opened the door from the inside. He was
holding S.B., and he told Cammisa that S.B. had fallen off the couch and was not moving. Cammisa
took S.B. from White and carried her into the living room, where she laid her on the floor. Cammisa
noticed dried blood around S.B.'s nose and mouth and a "very, very large" bump on the side of her
head. Cammisa asked White if he had called 9-1-1, and he said he had not. She told him to do so
but he instead went into another room and returned with S.B.'s car seat. Cammisa told him they
could not take S.B. to the hospital and repeated that they had to call 9-1-1, but White told her that
he could not find a phone. She told him that there was a phone on the microwave in the kitchen, and
he got the phone and called 9-1-1. Meanwhile, Cammisa was rubbing S.B.'s stomach and talking
to her. As she did so, S.B. started to move in "jerky" motions that "weren't normal baby
movements" and started moaning in an abnormal way. Cammisa noticed that S.B.'s blue eyes had
turned almost completely white and that her eyelids were half-closed. 

 A 9-1-1 operator received the call from White at approximately 9:45 p.m. and
immediately dispatched paramedics to the scene. Paramedic John Woljevach arrived at Cammisa's
house to find S.B. on the floor of the home in front of the couch and Cammisa and White nearby. 
Woljevach asked Cammisa and White what had happened to S.B., and they both told him that S.B.
had fallen off of the couch and hit her head on a plastic baby-wipes box. Woljevach noticed a stain
on White's shirt that appeared to be blood. He also noticed that S.B. was not moving, her eyes were
open, she had a "gazed" look, and she did not respond to noises in front of her. S.B. also had a knot
the size of a golf ball on the side of her head, scratches on her chin, bruises on her eyes and arms,
and dried blood on her nose, lip, and left hand. Upon assessing S.B.'s condition, Woljevach called
for a helicopter to fly her to a hospital in Temple. He also contacted a dispatcher to request that
police officers be sent to the scene based on his determination that S.B.'s injuries were not consistent
with a fall from the couch. 

 In the ambulance on the way to meet the helicopter, S.B. began "decerebrate
posturing," pushing her arms away from her body in a way that indicated a brain injury. One of her
pupils also began dilating, indicating pressure in the brain, and the knot on her head grew in size. 
After transferring S.B. to the helicopter, Woljevach returned to Cammisa's home to speak with
police officers. Upon returning, he noticed that White had taken off his shirt. 

 Police Officer Cassandra Fulton arrived at the scene, where she interviewed Cammisa
and White. White told Fulton that S.B. had fallen off the couch and hit her head on a baby-wipes
box. In a written statement, he wrote:


 [S.B.] was sleepin[g] in her bed and woke up. I picked her up and patted her back
to sleep. I put her down on the couch to go get a bottle, I heard a thud, turned around
and [S.B.] was on the ground. I ran over to her and she wasn't moving. I picked her
up, started looking for my phone, heard [Cammisa's] car, opened [the] door, and told
her [S.B.] had just fell [sic] off the couch and wasn't movin[g]. She took her and I
called 911. We do not discipline her due to her age. 



Cammisa told Fulton that S.B. was asleep on the mattress on the floor of the master bedroom when
she left the house. While Fulton was in the home, she also noticed a hole in the living-room wall,
which Cammisa said she had caused by punching the wall two weeks earlier during an argument
with her mother. Fulton collected the shirt White had previously been wearing and a sheet from the
mattress on the floor of the master bedroom that also appeared to have blood on it. 

 By the time the helicopter transporting S.B. arrived at the hospital in Temple, S.B.
was in critical condition and in a coma. One of her doctors testified that there was massive swelling
in her brain, her brain was bleeding, she had several skull fractures, and she had retinal hemorrhages. 
The doctor also found three partially healed rib fractures that he estimated had occurred at least
seven to ten days earlier.

 S.B. spent more than two months in the hospital, where she underwent brain surgery. 
When she was released from the hospital, her father and grandparents took her to live with them in
California. S.B. had two surgeries on her skull after arriving in California. At the time of trial, she
was legally blind and had limited use of the left side of her body. She was also developmentally
delayed, both physically and mentally.

 According to the testimony of Dr. David Hardy, a pediatric critical care physician and
one of the physicians who treated S.B. when she first arrived at the hospital in Temple, the injuries
suffered by S.B. could not have been caused by a fall from a couch. He felt so certain that a fall from
the couch could not have caused her injuries that it was "not even a close call" for him to make. 
Rather, he testified that injuries like S.B.'s were the kind he saw in children who were unrestrained
in high-impact car accidents in which they were thrown from the car or children who had been hit
in the head with a baseball bat or slammed against an object. Dr. Hardy also testified that the
injuries S.B. suffered would have caused immediate symptoms, such as loss of consciousness,
unusual facial expressions, a blank stare, and posturing. He testified that it would have been
immediately obvious and "profoundly noticeable" that she was hurt. He testified that the
observations of the paramedic who arrived on the scene were consistent with his expectations.

 White was indicted for intentionally or knowingly causing serious bodily injury to
S.B. by striking or hitting her with a deadly weapon or throwing, pushing, or slamming her against
a deadly weapon. A jury found him guilty as charged in the indictment. White elected to have the
trial court assess his punishment, and the trial court sentenced him to life imprisonment. After
receiving his sentence, White filed a motion for new trial, alleging that he was denied effective
assistance of counsel. After a hearing, the trial court denied the motion. This appeal followed. 


STANDARD OF REVIEW

 We review a trial court's denial of a motion for new trial for an abuse of discretion. 
Charles v. State, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004). Accordingly, when analyzing the
trial court's decision to deny a new trial based on ineffective assistance of counsel, we view the
relevant legal standards through the prism of an abuse-of-discretion standard. See Garza v. State,
261 S.W.3d 361, 364 (Tex. App.--Austin 2008, pet. ref'd). We do not substitute our judgment for
that of the trial court; rather, we decide whether the trial court's decision was arbitrary or
unreasonable. Charles, 146 S.W.3d at 208. We must view the evidence in the light most favorable
to the trial court's ruling and presume that all reasonable factual findings that could have been made
against the losing party were so made. Id. Thus, a trial court abuses its discretion in denying a
motion for new trial only when no reasonable view of the record could support the trial
court's ruling. Id. 


DISCUSSION

 To prevail on a claim of ineffective assistance of counsel, a defendant must show that: 
(1) counsel's performance was deficient in that it fell below an objective standard of reasonableness,
and (2) counsel's deficient performance prejudiced the defense, resulting in an unreliable or
fundamentally unfair outcome of the proceeding. See Strickland v. Washington, 466 U.S. 668, 687-88 (1984); Hernandez v. State, 726 S.W.2d 53, 56-57 (Tex. Crim. App. 1986) (adopting Strickland
two-prong test). To establish deficient performance as a matter of law under the first prong, a
defendant must show that no reasonable trial strategy could justify counsel's conduct. See
Strickland, 466 U.S. at 689; Andrews v. State, 159 S.W.3d 98, 102 (Tex. Crim. App. 2005). A
defendant establishes prejudice under the second prong if he shows that a reasonable probability
exists that, but for the deficient performance, the outcome of the proceeding would have been
different. See Strickland, 466 U.S. at 694; Ex parte Cash, 178 S.W.3d 816, 818 (Tex. Crim. App.
2005). A reasonable probability is a probability sufficient to undermine confidence in the outcome. 
Strickland, 466 U.S. at 694.

 It is the defendant's burden to prove ineffective assistance of counsel by a
preponderance of the evidence. Thompson v. State, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). In
determining whether an attorney's performance was deficient, we apply a strong presumption that
the attorney's conduct was within the wide range of reasonable professional assistance. Id. We
review the effectiveness of counsel in light of the totality of the representation and the circumstances
of each case. Id. In most cases, an undeveloped record on direct appeal is insufficient to satisfy the
requirements of Strickland because the reasonableness of counsel's decisions often involves facts
not appearing in the appellate record. Rylander v. State, 101 S.W.3d 107, 110 (Tex. Crim. App.
2003). Without evidence of the strategy and methods involved concerning counsel's actions at trial,
an appellate court should presume a sound trial strategy. See Thompson, 9 S.W.3d at 814.


Deficient Performance

 White contends that the totality of the circumstances of his trial counsel's
representation establish that his trial counsel provided ineffective assistance of counsel. The "totality
of the circumstances" alleged by White include eight allegations of deficient performance. 
Specifically, White asserts that his trial counsel failed to: (1) seek out and interview potential
witnesses for the guilt/innocence and punishment phases of trial; (2) adequately investigate a
photograph taken by Cammisa that may have shown Cammisa to be lying; (3) present available
defense theories during the guilt/innocence phase of trial; (4) pursue a dismissal of the charges before
trial; (5) make a proper objection to the admission of voluminous medical records; (6) obtain a ruling
on his fourth motion in limine; (7) allow appellant to testify during the guilt/innocence phase of trial;
and (8) adhere to the motion in limine. We address each allegation in turn. 

 A. Failure to Seek Out Potential Witnesses 

 In his first allegation of deficient performance, White contends that his trial counsel,
Michael White ("Counsel"), (1) failed to make reasonable efforts to present the testimony of several
witnesses who would have aided White's defense during the guilt/innocence and punishment phases
of trial. At the hearing on White's motion for new trial, White presented six witnesses who he
alleged were available to testify but were not called to do so during the trial. The witnesses included
Debbie Hefner, one of White's friends; Jane Anderson, White's mother; Willamina Nolten, White's
former mother-in-law; Raycinda Buxton, one of White's former co-workers; Lucy Day, another of
White's former co-workers; and Nicholas Hefner, another of White's friends. White also presented
a seventh witness--Sergeant Brady Miller, his supervisor--who had testified at the punishment
phase of trial but not at the guilt/innocence phase. None of the witnesses had any knowledge of the
circumstances of the crime itself; rather, they all testified generally that they felt White was not
capable of harming a child, and some of them further testified that they were so confident in White's
child-care abilities that they would leave their own children or grandchildren in his care. 

 Two of the witnesses, Anderson and Miller, complained of Counsel's contact with
them during White's trial. Anderson testified that Counsel's office called her to tell her the date of
the sentencing hearing only two days before the hearing. Because she lived in New York and did
not have the money for an airplane ticket on such short notice, she was unable to attend the hearing. 
Anderson also testified that she called Counsel's office a number of times trying to reach him but
always had to leave a message asking him to call her back. She testified that he never returned her
calls. Miller testified that he was never contacted by Counsel during the trial. He explained that he
learned of White's sentencing hearing only because someone from the probation office called to ask
him a question about White's military status in the event of a conviction. He decided to attend
White's sentencing hearing of his own accord, and when he arrived, White introduced him to
Counsel. It was at that point that Counsel suggested Miller testify on White's behalf, which Miller
agreed to do. Miller further testified that if Counsel had contacted him, he could have given Counsel
the names of a number of soldiers who would also have testified as to White's good character. 

 Counsel commented on this issue at the sentencing hearing and the hearing on
White's motion for new trial. At the sentencing hearing, Counsel stated: 


 Your Honor, for purposes of the record, the PSI does reflect some--the family
relationship that [White] has with some relatives in New York.

 

 My paralegal and I have made exhaustive efforts to contact relatives. We actually
had a sister on the phone. We had his mother on the phone, and some other members
of his family on the phone. They've advised me they could not afford the trip to
Texas from New York; and [White] has represented that to me on previous
occasions, at pretrials and at the trial, that that would sort of be cost prohibitive for
them, as well.


 Michael Harris has been somebody referred to today. We reached out to him. His
numbers aren't good any more. He left us about three or four phone numbers. He
told me he was soon to deploy to Iraq. And those are pretty much the exhaustive list
that we've tried to contact, other defense witnesses for purposes of the sentencing
hearing today. 



 At the hearing on the motion for new trial, Counsel responded to several questions
about possible defense witnesses. Regarding his contact with White's mother, Counsel stated that
he had notified White's mother on three different occasions that he represented White. He testified
that she informed him from the beginning that she could not afford to travel to Texas. Regarding
other witnesses, Counsel testified that he attempted to contact every witness whose name White gave
him and that he asked White for additional witnesses, but White told him he had no additional
witnesses at that time. He testified that the only names White gave him as possible witnesses in the
guilt/innocence phase of trial were those of Michael Harris and his wife, who had been at Cammisa's
home earlier in the day on the day of the crime. Counsel stated that he contacted the husband on
several occasions and that the couple eventually ended up providing statements. Counsel testified
that parts of the couple's statements were helpful to White and parts were "pretty bad." The negative
aspects of their statements were highlighted when the prosecutor used portions of the statements to
impeach White at the punishment hearing, and White's new attorney ("Appellate Counsel") (2) later
called the portions "damning extracts" at the hearing on the motion for new trial. Thus, the record
shows that the statements would not necessarily have been beneficial to White. 

 Further, the record is otherwise silent as to the significance and relevance of the
couple's statements. The record suggests that the couple was at Cammisa's home earlier in the day
on the day of the crime, but there is nothing in the record to suggest that either of them was a witness
to the circumstances of the crime itself. The portions of their statements used to impeach White at
his punishment hearing addressed contact the couple had with White at some point after the day of
the crime. Specifically, the portions of the statements used for impeachment purposes focused on
ways in which the story White told the couple about what happened on the night of S.B.'s injury
differed from the story he told police. Given the lack of evidence in the record establishing the
relevance of the Harrises' statements, and given the potentially harmful nature of portions of their
statements, we conclude that White has failed to rebut the presumption that Counsel's decision to
not offer their statements was a reasonable one. (3) See Thompson, 9 S.W.3d at 814. 

 Regarding Miller, Counsel testified that he spoke with Miller two times. He stated
that Miller was a "[v]ery nice gentleman, but [had] nothing relevant regard[ing] . . . guilt or
innocence." Counsel also testified that he contacted a female whom he believed to be White's sister. 
When the woman answered the phone, she stated that she did not consider herself to be White's
sister. Counsel explained that White told him he had a "very strained relationship with his family
members and didn't know if they would be of any benefit." Counsel testified that when he
contacted White's family members, "what [White] had told [him] rang true as [he] spoke to them
on the phone."

 Although White presented several witnesses at the hearing on his motion for new trial
who were not presented during his trial, the record provides plausible explanations as to Counsel's
reasons for not calling the witnesses during trial, particularly considering that we must view
Counsel's conduct from his perspective at the time the conduct occurred and not with the benefit of
hindsight. See Robertson v. State, 187 S.W.3d 475, 482 (Tex. Crim. App. 2006) (quoting Strickland,
466 U.S. at 689) ("A fair assessment of attorney performance requires that every effort be made to

eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged
conduct, and to evaluate the conduct from counsel's perspective at the time."). Counsel testified that
he contacted all of the witnesses provided to him, including some of White's relatives, and the
witnesses he spoke with either could not or would not attend the hearings. Further, although
Anderson testified that she was contacted only days before the sentencing hearing and Miller testified
that he was not contacted at all, the trial judge, as the sole judge of the credibility of the witnesses,
was free to believe Counsel's testimony and disregard the testimony of Anderson and Miller. Lewis
v. State, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995); Acosta v. State, 160 S.W.3d 204, 210 (Tex.
App.--Fort Worth 2005, no pet.). Accordingly, we reject White's allegation.


 B. Failure to Investigate Photo Taken by Cammisa

 White's second allegation of deficient performance is that Counsel failed to
investigate the contents of a photo taken by Cammisa. During the trial, Cammisa testified that after
leaving White's barracks on the night of the crime, she took a photo of the full moon using the
camera on her mobile phone. During Miller's testimony at the hearing on the motion for new trial,
White introduced a photo taken by Miller the day before the hearing that depicted a "7-Eleven"
convenience-store sign, overhead power lines, and a power-line pole in a location that alleged was
less than a mile from Cammisa's home. Appellate Counsel alleged that the original photo taken by
Cammisa also contained a 7-Eleven sign and power pole, neither of which could be found near
White's barracks. In his brief, White contends that the photo taken by Miller suggests that Cammisa
lied about where she was when she took the photo. As further support for his contention, White also
points out that while he was being interrogated by an investigator for the district attorney's office
after he took a polygraph test, the investigator told him that the photo of the moon could not have
been taken at Fort Hood. Consequently, White alleges that Counsel's failure to investigate the
contents of the photo as a possible avenue for attacking Cammisa's credibility constituted deficient
performance.

 At the hearing on the motion for new trial, the only question asked of Counsel
regarding his reasoning for not further investigating the photo was why he did not investigate in
response to the district attorney investigator's comment to White that the photo could not have been
taken at Fort Hood. Counsel stated: "I'm assuming that [the investigator] doesn't know that [the
photo could not have been taken at Fort Hood]. That's a common technique that's used, whether
it's involving a polygraph or not."

 Considering the lack of evidence in the record, we conclude that Counsel's
performance was not deficient. To begin with, the original photograph taken by Cammisa is not in
the record. Thus, it is unclear whether the photo taken by Miller the day before the hearing on the
motion for new trial did or did not resemble the original photo. In addition, the only testimony
Cammisa offered regarding the photo was that she took it "as [she] was leaving [White's] barracks
room." She did not specify an exact location. Thus, it is not clear from the record that the location
of the photo holds any significance regarding Cammisa's credibility. (4) Further, White did not call
the district attorney's investigator to the stand to testify as to his statement that the photo could not
have been taken at Fort Hood. Thus, the record does not provide any evidence to support the truth
or reasoning of the investigator's comment. Accordingly, White's allegation is not firmly founded
in the record. See Thompson, 9 S.W.3d at 814. 

 In addition to the absence of evidence in the record, we also note that Counsel's
explanation--that he assumed that the investigator's comment was part of a common interrogation
technique--is a plausible basis for his decision not to inquire into the matter further. Because the
record does not affirmatively demonstrate the alleged deficient performance, and because Counsel
provided a reasonable explanation for his decision not to investigate the photo further, we reject
White's allegation. 


 C. Failure to Present Available Defense Theories

 In his third allegation of deficient performance, White asserts that Counsel failed to
explore Cammisa's history of punching holes in walls and failed to explore several other comments
made by the district attorney's investigator about Cammisa's credibility during the investigator's
interrogation of White. Specifically, White contends that Counsel failed to: (1) cross-examine
Cammisa about her history of punching holes in walls; (2) present the testimony of Cammisa's
mother regarding Cammisa's history of punching holes in walls; (3) present to the jury a comment
made by the district attorney's investigator that if White did not give a statement saying that
Cammisa hurt S.B., White would be "thrown under the bus"; (4) present to the jury a comment made
by the district attorney's investigator that he had statements from Cammisa's neighbors that
Cammisa's car never left the house that night; and (5) present to the jury a comment made by the
district attorney's investigator that a friend of Cammisa's who Cammisa testified she saw at the
barracks the night of the crime had told police that he did not see her that night. 

 We first note that the record is silent as to Counsel's reasoning for not calling
Cammisa's mother as a witness. Thus, White has failed to rebut the presumption that Counsel's
decision was a reasonable one. See id. Regarding Counsel's reasoning for not cross-examining
Cammisa about her history of punching holes in walls, Counsel explained that he "did cross-examine
[Cammisa] on a number of things, including the hole in the wall and the injuries of the child and
some other things." Counsel further explained his cross-examination of Cammisa as follows:


 There [are] some [possible credibility issues] that I explored and went through with
[Cammisa]. There is some trial strategy because you have to be very careful when
you're cross-examining the mother of . . . a severely disabled child. So I crossed her
on the fact that there was in the medical records additional injuries, rib fractures,
bruisings and even injuries that occurred that day to [S.B.'s] eye with a toy, some
other injuries that as a mother that she knew or should have known of those existing
injuries, those pre-existing injuries, and that in fact she might be responsible for those
injuries. And I went into those areas in front of the jury. 



 The record shows that during the trial, Counsel questioned Cammisa about a hole that
was punched in the wall approximately two weeks before the crime occurred. Cammisa admitted
that she punched the hole in the wall during an argument with her mother. Counsel also asked
Cammisa about the other injuries to S.B. that doctors discovered--specifically, S.B.'s partially
healed rib fractures. Counsel asked Cammisa to confirm that the doctors' estimate of the time S.B.'s
rib fractures most likely occurred was about the same time that Cammisa punched a hole in the wall,
and Cammisa confirmed that it would have been about the same time.

 Although Counsel did not question Cammisa about a history of punching holes in
walls, he questioned her about the hole in the wall that was most relevant to the case and that raised
implications about her temper and the possibility that she could have harmed S.B. on the day of the
crime. Counsel's explanation that he felt he needed to be careful when cross-examining the mother
of a severely disabled child provides a reasonable basis for limiting his cross-examination of
Cammisa to the most relevant issues. 

 Regarding the comments made by the district attorney's investigator that seemed to
cast suspicion on Cammisa, Counsel testified that he did not present the testimony of the district
attorney's investigator because he did not think the investigator "spoke for the department." When
questioned as to whether the investigator's comments would have been admissible at trial, Counsel
stated:


 If [they] had been admissible, I think that it would have also been admissible that
there [are] a dozen other alternate theories as to how [White] committed this crime
as well. So, no, I would not have explored that area. I would not call [the
investigator] or anyone else in the D.A.'s office to go into all the possible theories as
to why [White] might be guilty or why he might not be guilty. No.


Regarding the reasons for the investigator's comments, Counsel further stated:


 That might have been [the investigator's] personal opinion or that might have been
[his] modus operandi for interrogating someone or talking to someone after a
polygraph, or an alternate theory. I'm not going to go into that area. And that would
be bad trial strategy to sit there and have them go further into all the possible theories
of why [White] might be guilty.



When asked about the same issue by the prosecutor, Counsel stated that "the rule is that you don't
ask questions you don't know the answer to, and you certainly don't call witnesses to testify that you
don't know exactly what they are going to say."

 Counsel's explanation provides a reasonable basis for his decision not to present the
comments of the district attorney's investigator to the jury. Counsel did not know whether the
investigator's comments were an interrogation tactic, a theory about the crime, or something else. 
Raising the issue could have opened the door to testimony that could have been harmful to White,
and Counsel was not ineffective for deciding not to elicit testimony that could have been more
harmful than helpful to his client. See Damian v. State, 881 S.W.2d 102, 110 (Tex. App.--Houston
[1st Dist.] 1994, pet. ref'd). In addition, White did not present the testimony of the investigator at
the hearing on the motion for new trial and did not otherwise present evidence supporting any of the
investigator's comments. Thus, he failed to develop the record sufficiently to establish deficient
performance. See Thompson, 9 S.W.3d at 814. 


 D. Failure to Pursue Pre-trial Dismissal

 In his fourth allegation, White contends that Counsel failed to seek a pre-trial
dismissal of the case based on evidence that White's polygraph examination had been "rigged." 
Specifically, White refers to a comment made by the polygraph examiner to White after the
polygraph examination to the effect that White could not have known if Cammisa was present when
S.B. received her injury if White had not seen the injury inflicted or been told by Cammisa that she
harmed S.B. (5) At the hearing on the motion for new trial, Appellate Counsel asked Counsel how
White could have answered the question "Was [Cammisa] present when the child sustained her
injuries?" without being deceptive if White did not know when the injuries occurred. After a series
of sustained objections, Counsel was never able to answer the question. When questioned about
whether he told the prosecutor that he thought the polygraph was rigged, Counsel answered, "No." 
Although Counsel stated that he did not think the polygraph was fair, Appellate Counsel never asked
Counsel if he believed the polygraph was intentionally rigged, or if he did so believe, why he did not
inform the prosecutor of the situation or pursue a pre-trial dismissal in the case. Because the record
is silent as to Counsel's thoughts and reasoning on the matter, White has failed to rebut the
presumption that Counsel's decision was reasonable. See Thompson, 9 S.W.3d at 814. We therefore
reject White's allegation. 


 E. Failure to Make Proper Objection to Medical Records

 White's fifth allegation of deficient performance is that Counsel failed to object to
the admission of 2,215 pages of medical records on the basis that the volume of the records made
them substantially more prejudicial than probative under Rule 403 of the rules of evidence. See Tex.
R. Evid. 403. When the prosecution moved to admit the medical records at trial, Counsel objected
to the records based on allegations that the records contained hearsay and violated the Confrontation
Clause of the U.S. Constitution. Counsel asked for a running objection on those bases, which the
trial court denied. Counsel did not object based on Rule 403 of the rules of evidence. 

 Although White argues that Counsel should have objected based on Rule 403, the
record does not provide evidence of Counsel's reasoning for not objecting on that basis. At the
hearing on the motion for new trial, Appellate Counsel made comments about the volume of the
records but did not question Counsel about the issue. Because the record is silent as to Counsel's
reasoning, White's complaint as to this issue is not firmly founded in the record. See Thompson,
9 S.W.3d at 814.


 F. Failure to Obtain a Ruling on Fourth Motion in Limine

 In his sixth allegation of deficient performance, White asserts that Counsel failed to
obtain a ruling on his fourth motion in limine, which requested that the prosecution be required to
first seek permission of the trial court outside the presence of the jury before questioning any witness
regarding matters about which the witness did not have personal knowledge. At a pretrial hearing,
the trial court granted Counsel's first three motions in limine before turning to the fourth motion. 
In addressing the fourth motion, the trial judge stated that he believed that matters not within the
personal knowledge of the witnesses would best be handled by objections during the trial and that
he would be alert for any such objections Counsel might make. The trial judge went on to conclude
that he was "not going to grant that ahead of trial." Thus, the trial court denied Counsel's motion. 
Accordingly, Counsel did not fail to obtain a ruling on the motion. 

 Even if Counsel had not obtained a ruling, the record is silent as to any reasoning for
not doing so. Thus, White has failed to rebut the presumption that Counsel's decision was a
reasonable one. See id. 


 G. Failure to Allow Appellant to Testify

 White's seventh allegation of deficient performance is that Counsel "refused" to allow
White to testify during the guilt/innocence phase of trial. White attached an affidavit to his motion
for new trial in which he stated that he "asked, during the Guilt/Innocence phase of the trial, to be
allowed to testify and was told (by [Counsel]) 'No, your [juvenile] record will be used against you'
. . . ." When questioned about the issue at the hearing on the motion for new trial, Counsel stated
that he talked to White about White's testimony "many times," and that the decision for White not
to testify at the guilt/innocence phase was White's "ultimate decision" but was based on Counsel's
advice that White not testify. 

 Although both Counsel's and White's statements support a determination that
Counsel advised White not to testify, there is no evidence in the record that Counsel "refused" to
allow White to testify, and White did in fact testify during the punishment phase despite Counsel's
advice against it. Thus, White fails to show how Counsel refused to allow him to testify at the
guilt/innocence phase of trial but did not refuse to do so during the punishment phase even though
Counsel advised against him testifying in both phases. Further, Counsel was not questioned at the
hearing on the motion for new trial as to his reasoning for advising White not to testify. Thus, the
record reveals only White's statement that Counsel's reasoning was based on the potential danger
of White's juvenile record being used against him. Given the reasonableness of Counsel's fear that
White's juvenile record may harm him more than his testimony would help him, and given the strong
presumption of sound trial strategy we must apply to ineffective assistance claims, we reject White's
allegation. See id.


 H. Failure to Adhere to Motion in Limine

 In his eighth allegation of deficient performance, White contends that Counsel was
deficient in purposely eliciting evidence of extraneous offenses and thus violating his own motion
in limine, which excluded any references to extraneous offenses without the trial court first
conducting a hearing outside the presence of the jury. The specific evidence of extraneous offenses
that Counsel allegedly elicited was testimony about the partially healed rib fractures suffered by S.B.
approximately two weeks prior to the crime. At the hearing on the motion for new trial, Appellate
Counsel asked Counsel why he allowed the prosecution to elicit testimony regarding the partially
healed rib fractures without first objecting and asking the trial court to hold a hearing outside the
presence of the jury. In response, Counsel stated:


 I actually brought out the testimony regarding the previous injuries to the child. I
think [the doctor] touched on it during direct with the State, but I actually went into
it because I thought that was trial strategy to show that those injuries pre-existed the
day that [White] was accused of this offense and could possibly have been
[Cammisa]. 



 In the trial exchange referenced by Counsel, he asked Cammisa several questions
about the partially healed rib fractures discovered by doctors who treated S.B. Cammisa testified
that she was aware that the doctors discovered the rib fractures but that she had never noticed injuries
like that on S.B. Cammisa acknowledged that the time that the doctors estimated the rib fractures
likely occurred--two weeks prior to the crime--was the same time that she had punched a hole in
the wall during an argument with her mother. Counsel then went on to question Cammisa about
several bruises found on S.B. and whether Cammisa knew the cause of the bruises. He also elicited
testimony from Cammisa in which she stated that she never saw White injure S.B. in any way.

 The questions Counsel posed to Cammisa about the preexisting injuries to S.B.
suggested that the injuries could have been caused by Cammisa, not White. Thus, we disagree that
evidence of the injuries constituted evidence of "extraneous offenses" committed by White. Further,
Counsel's decision to bring up the issue of the previous injuries was reasonable given the constraints
within which he had to develop his trial strategy. Specifically, Counsel's strategy had to incorporate
White's statement to police that Cammisa was not present prior to S.B. showing signs of injury and
the doctor's testimony that S.B.'s injury would be immediately obvious after it was inflicted and
could not be caused by a fall from a couch. 

 At the hearing on the motion for new trial, Counsel explained that it was his strategy
throughout trial to raise a reasonable doubt that White committed the crime and that he attempted
to do so by offering evidence suggesting that Cammisa could have committed the crime. He testified
that given White's unwavering position that Cammisa was not present for a substantial period of
time before S.B. showed signs of injury, he had to do "the best [he] could, even against the medical
experts that testified, to say that this might have happened earlier in the day or right prior to
[Cammisa] leaving the home . . . ." Considering the evidence Counsel had to work with, it is
reasonable that he would choose to cross-examine Cammisa about injuries to S.B. that occurred
approximately two weeks prior to the crime and at about the same time that Cammisa punched a hole
in the wall of her home. We therefore disagree that Counsel's conduct was deficient. (6) 


 I. Conclusion Regarding Deficient Performance

 Because we reject White's allegations, we conclude that White has failed to prove
by a preponderance of evidence that his counsel's performance was deficient. See Strickland, 466
U.S. at 689; Andrews, 159 S.W.3d at 102. 


Prejudice

 Even if we had determined that Counsel's performance was deficient, White fails to
prove the second element of his claim: that Counsel's deficient performance prejudiced the defense,
resulting in an unreliable or fundamentally unfair outcome of the proceeding. Strickland, 466 U.S.
at 687-88. As previously stated, for White to establish the second element of his claim, he must
show that there is a reasonable probability that, but for his counsel's deficient performance, the
outcome of the proceeding would have been different. See id. at 694. White fails to show that
absent any errors by Counsel, there is a reasonable probability that the jury would have found him 
not guilty of the crime. 

 In the statement White gave to police officers who arrived on the scene, he claimed
that when S.B. woke up from a nap, he picked her up and patted her until she fell back to sleep. He
stated that he then laid her down on the couch and went to get a bottle. At that point, he heard a
thud, turned around, and saw S.B. on the ground. She was not moving. He picked her up and began
looking for a phone when he heard Cammisa arrive at the home. He told Cammisa that S.B. had
fallen off the couch and that she was not moving. White did not change his version of events at any
time before or during trial. 

 The paramedic who first arrived at the scene testified that upon his arrival, S.B. was
not moving, her eyes were open, she had a "gazed" look, and she did not respond to noises in front
of her. He testified that S.B. also had a knot the size of a golf ball on the side of her head, scratches
on her chin, bruises on her eyes and arms, and dried blood on her nose, lip, and left hand. He further
testified that S.B.'s condition worsened quickly once she was in the ambulance on the way to the
helicopter. The physician who treated S.B. when S.B. arrived at the hospital testified that the injuries
S.B. suffered would have caused immediate symptoms such that it would have been immediately
obvious and "profoundly noticeable" that she was hurt. The doctor testified that the observations
of the paramedic who arrived on the scene were consistent with his expectations.

 Given the evidence of the severity of S.B.'s injuries and the immediacy with which
the injuries would have become apparent, and given both Cammisa's and White's unvarying
positions that Cammisa was not present at the time S.B. started showing signs of injury, we conclude
that White has not shown a reasonable probability that, but for his allegations of deficient
performance, the outcome of the proceeding would have been different. See id. Even if Counsel had
done all the things that White alleges he should have done--including calling additional character
witnesses to testify that they knew White to be good with children; further investigating Cammisa's
credibility and history of violence; raising a pre-trial allegation that White's polygraph was rigged;
objecting to the amount of medical records admitted at trial; and permitting White to testify at
trial (7)--none of his conduct would have led to evidence that contradicted or otherwise affected the
existing evidence that by White's own account, he was the only person with S.B. when she began
showing signs of an injury that, according to expert medical testimony, would be immediately
noticeable upon infliction and could not be caused by a fall from a couch. That evidence alone could
lead a reasonable jury to find White guilty. Accordingly, even if White had proven that Counsel's
performance was deficient, he has failed to prove that he was prejudiced by Counsel's actions. See
id. 

CONCLUSION

 Because White has failed to prove by a preponderance of the evidence that his trial
counsel provided ineffective assistance, we affirm the trial court's judgment. 


 __________________________________________

 Diane M. Henson, Justice 

Before Chief Justice Jones, Justices Waldrop and Henson 

Affirmed

Filed: February 26, 2010

Do Not Publish
1. Because White and his trial counsel share the same surname, we will call trial counsel
"Counsel" throughout this opinion to avoid confusion. 
2. To avoid confusion between White's trial attorney and the attorney who has represented
him since he filed a motion for new trial, we will call his current attorney "Appellate Counsel"
throughout the rest of the opinion. 
3. Regarding the Harrises' live testimony, we have already addressed Counsel's testimony
at the punishment hearing that he tried to contact Michael Harris but that Harris's "numbers
[weren't] good any more" and that Harris told him "he was soon to deploy to Iraq." Because the
record is silent as to whether Harris's wife was available to testify, and if so, Counsel's reasons for
not calling her as a witness, we do not address the issue. See Thompson v. State, 9 S.W.3d 808, 814
(Tex. Crim. App. 1999). 
4. White also fails to address the fact that the photo, regardless of where it was taken, still
establishes that Cammisa was not at home prior to the time that S.B. began showing signs of injury. 

5. The record shows that White's depiction of the polygraph examiner's comment is
inaccurate. The videotape of White's interrogation shows that the polygraph examiner's comment
to White was made in response to White's statement that he did not see Cammisa hurt S.B. but that
he "knew" that she must have done so. The examiner responded that White could not have known
that Cammisa harmed S.B. if he had not seen the injury inflicted or been told by Cammisa that she
did so. No reference was made to White's knowledge of Cammisa's presence at the house. 
6. White also cites to Robertson v. State, 187 S.W.3d 475 (Tex. Crim. App. 2006), in support
of his argument that Counsel provided ineffective assistance by questioning Cammisa about S.B.'s
partially healed rib fractures. However, Robertson is distinguishable from this case. In Robertson,
trial counsel elicited testimony from the defendant regarding the defendant's previous convictions
and incarcerations in an effort to establish that the defendant was truthful. 187 S.W.3d at 480-81. 
Here, Counsel elicited testimony from another witness about previous injuries to the victim in an
effort to establish that the other witness, not the defendant, was responsible for the injuries. Because
Robertson is substantially different from this case, we are not persuaded by White's argument. 
7. We assume that White's testimony at trial would have been the same as his testimony at
the sentencing hearing, in which he maintained the same story as he had provided to police: that he
was alone with S.B. when she fell off the couch and began showing signs of injury.